**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Plaintiff,**

**v.**

**CONTINENTAL ILLINOIS CORPORATION, et al., Defendants.**

**HARBOR INSURANCE COMPANY and Allstate Insurance Company, Plaintiffs,**

**v.**

**CONTINENTAL ILLINOIS CORPORATION, et al., Defendants.**

Nos. 85 C 7080, 85 C 7081.

United States District Court, N.D. Illinois, E.D.

July 24, 1987.

---

James G. Hiering, Dennis C. Waldon, Jeffrey I. Berkowitz and A. Benjamin Goldgar, Keck, Mahin & Cate, Chicago, Ill., for plaintiffs.

Roger W. Barrett, Franklin P. Auwarter, Michele Odorizzi, Mayer, Brown & Platt, H. Blair White, Walter C. Carlson, Sidley & Austin, Lowell E. Sachnoff, Barry S. Rosen, Candace J. Fabri, and Carolyn Rosenberg Safer, Sachnoff, Weaver & Rubenstein, Chicago, Ill., for defendants.

### MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Allstate Insurance Company ("Allstate") and National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") (collectively "Insurers")[1] have sued Conti-

---

1. Shortly before this opinion was written, counsel for defendants and for Harbor Insurance

nental Illinois Corporation ("CIC"), its subsidiary Continental Illinois National Bank and Trust Company of Chicago ("Bank")[2] and a host of other defendants, seeking to avoid liability under the directors' and officers' ("D & O") liability policies (the "Policies") Insurers had issued to CIC.[3] Defendants now move for judgment on the pleadings under Fed.R.Civ.P. ("Rule") 12(c) on Counts III, IV, V and VI of Insurers' Amended Complaints.[4] For the reasons stated in this memorandum opinion and order, that motion is granted in principal part and denied in limited respects.

## Standards for Decision

Rule 12(c) motions, like those for summary judgment, are designed to achieve a resolution of claims on their merits. Unlike the summary judgment motion, however, the Rule 12(c) motion limits the court to the pleadings themselves and to matters subject to judicial notice. 5 Wright & Miller, *Federal Practice and Procedure: Civil* § 1367, at 685 (1969).

Because Insurers are the nonmovants, all well-pleaded allegations in the Complaints must be accepted as true and all reasonable inferences drawn in Insurers' favor. *Re-*

*public Steel Corp. v. Pennsylvania Engineering Corp.*, 785 F.2d 174, 177 n. 2 (7th Cir.1986).[5] Evidentiary submissions are unnecessary (or, more accurately, inappropriate), for the question is which party is entitled to judgment as a matter of law on the assumption that all Insurers' well-pleaded factual allegations are true.

Despite their right to such favorable assumptions and despite this Court's admonitions to the contrary, Insurers included evidentiary submissions with their memorandum in opposition to defendants' motion. They insist such matters outside the pleadings are necessary to put their allegations and the legal issues "in full context," and they urge consideration of those matters by converting defendants' motion into a Rule 56 motion for summary judgment. It is scarcely surprising that defendants (likely out of an abundance of caution) responded with rebuttal evidence accompanying their reply memorandum, while at the same time insisting matters outside the pleadings were not necessary for resolving their motion.

Where both sides have thus tendered materials outside the pleadings, a court may properly opt to convert a Rule 12(c) motion

Company ("Harbor") (the insurance carrier providing the primary coverage) represented orally at a status hearing that they had agreed to a settlement of Harbor's claims and of defendants' counterclaims against Harbor. Though the settlement is conditioned on certain approvals, counsel suggested current motions be dealt with as though Harbor were not an active litigant. This opinion is the first to have done so.

**2.** CIC and Bank are collectively called "Continental."

**3.** Because this Court has typically begun all its opinions in these cases with the same opening description, some means of early differentiation is useful. Solely for that purpose, it is noted this is this Court's twenty-third written opinion since the cases were assigned to its calendar after a series of recusals by other judges of this District Court. For the same ease in reference, earlier opinions will also be cited by number.

**4.** After defendants' current motion was filed and partially briefed, this Court granted Insurers leave to file their Amended Complaints (the "Complaints") in the Eighteenth Opinion, 658 F.Supp. 781 (N.D.Ill.1987). That makes the Complaints the relevant pleadings for Rule 12(c)

purposes (only one new allegation was added to Count 4 by the Complaints, and both sides have addressed the effect of that new allegation). As for the contents of the Complaints, their allegations are essentially parallel. Any differences between them are not relevant for current purposes, so for brevity's sake (*something* ought to be done in the interest of brevity in these cases) this opinion will simply:

    1. refer to "Count—" (using Arabic rather than Roman numerals for convenience), treating both Complaints as one; and

    2. cite to specific allegations in the form "¶ —."

**5.** As with almost every general rule, there are of course caveats. *Hargis Canneries, Inc. v. United States,* 60 F.Supp. 729, 729 (W.D.Ark.1945) (citations omitted) explains:

The motion for judgment on the pleadings admits all facts well pleaded, but does not admit conclusions of law; facts which the court will take judicial notice are not true; legally impossible facts; facts which would be inadmissible in evidence in the event of a trial nor facts which might appear by a record or document included in the pleadings to be unfounded.

into one for summary judgment. *Republic Steel*, 785 F.2d at 178. In this case, however, such a conversion would be both premature and unnecessary. Insurers themselves point out that discovery in these cases is still ongoing. Insurers are therefore unprepared or unable to proffer evidence in support of many of their factual allegations.[6]

In any event, what evidence Insurers have submitted adds nothing to their claims. In the context of defendants' Rule 12(c) motion, judgment can be entered on those claims as a matter of law, with only one real exception. For that reason both sides' evidentiary submissions are stricken, and this opinion proceeds on the assumption that all Insurers' allegations in Counts 3, 4, 5 and 6 are true.[7]

### Underlying Litigation

Several of the earlier opinions in these cases (see, e.g., 116 F.R.D. 252, 253 n. 4 (1987)) have used the term "underlying litigation" in referring to the numerous actions brought against Continental and its officers and directors that could result in claims under Insurers' Policies. Until now it has never been necessary to define precisely what that term comprises. Now it is: Although Counts 4 and 5 seek declaratory judgments as to specific *types* of claims, Counts 3 and 6 ask similar relief as to specific *claims*. Insurers and defendants disagree as to what claims are included in Counts 3 and 6.

Complaint ¶¶ 97–99 in fact define the underlying claims for purposes of deciding

Insurers' claims here. Those underlying claims were made in these cases:

1. *Goodman v. CIC*, Master File No. 82 C 4712 (N.D.Ill.) (also referred to as *In re Continental Securities Litigation* and the *Consolidated Litigation* ), which includes class and derivative claims; [8]

2. *Frankenstein v. CIC*, No. 82 L 50353 and *Vlahandreas v. CIC*, No. 82 CH 8526, which contain only derivative claims and were both originally filed in the Circuit Court of Cook County (*Vlahandreas* was later filed as No. 7146 in the Chancery Court of New Castle County, Delaware);

3. *Spring v. CIC*, 84 C 4648, *Rothschild v. CIC*, 84 C 8596 and *DiLeo v. Raymond C. Baumhart*, 84 C 7305, all of which were filed in this District Court and contain only class claims; and

4. *California Public Employees' Retirement System v. CIC*, 85 C 9872 (N.D. Ill.), which contains only individual claims.

Although Continental originally refused to assume the derivative claims, on September 26, 1984 those claims were assigned to Federal Deposit Insurance Corporation ("FDIC") and FDIC was then substituted for the derivative plaintiffs in the derivative cases (*Consolidated Litigation, Frankenstein* and *Vlahandreas* ). FDIC filed a Second Amended Complaint in *Consolidated Litigation* (recaptioned *FDIC v. Anderson*, 82 C 4712 (see IX 1)), realleging the derivative claims and adding claims for

---

**6.** Insurers could not limit a summary judgment motion to discrete issues within their various claims. *Teamsters Local 282 Pension Trust Fund v. Angelos*, 649 F.Supp. 1242, 1252–53 (N.D.Ill.1986). And if *they* became the movants for summary judgment, they would bear the burden of proof and would be obligated to come forward with evidence in support of *all* the essential elements of those claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Conversely, the notion that a nonmovant (such as Insurers) can unilaterally convert the movant's motion into one for summary judgment is an odd one at best.

**7.** Although many of the parties' exhibits have been stricken, it will still be necessary to refer

to some of them, using the forms "IX—" for Insurers', "DX—" for defendants' initial set and "DRX—" for defendants' exhibits attached to their reply memorandum (where they started the alphabet anew even though their original memorandum had already used the letters "A" through "E").

**8.** None of the parties refers to that case the same way. That alone may be the reason for some of the confusion. Because the "case" is really a consolidation of several cases that included class and derivative claims, this opinion will refer to 82 C 4712 as the *"Consolidated Litigation."*

breach of contract and breach of fiduciary duty.[9]

As defendants' memoranda correctly point out, many of the underlying claims have been settled. FDIC settled its claims (both the original derivative claims in *Frankenstein, Vlahandreas* and *Consolidated Litigation* and its later claims in *FDIC v. Anderson* ) against certain of Continental's directors and officers. As part of the settlement agreement, those directors and officers assigned their rights under the Policies to FDIC. That settlement is the source of FDIC's Counterclaim against Insurers (see the Eleventh Opinion, 113 F.R.D. 527, 529 (N.D.Ill.1986)).[10] All the class claims in *Consolidated Litigation* have been settled too. Again as part of that settlement the defendant directors and officers assigned their rights under the Policies to the plaintiff class, which then unsuccessfully tried to intervene in these cases to assert their assigned rights against Insurers (see the Twelfth Opinion, 113 F.R.D. 532 (N.D.Ill.1986)). Finally, the class claims in *Spring* and *Rothschild* have also been settled. Continental has indemnified its officers and directors for the costs of that settlement and has filed a counterclaim against Insurers to recover those amounts under the Policies.

Defendants have assumed those settled claims are the only relevant underlying claims for Counts 3 and 6. They acknowledge the continued pendency of the claims in *DiLeo* (now an individual rather than a class action) and *California Retirement,*[11] but they somewhat lamely insist those

claims are not relevant to Counts 3 and 6.[12] They are wrong.

Count 3 seeks a declaration regarding only "the Class Action, Derivative and FDIC Litigation" (¶ 126), terms of art defined in ¶¶ 97–99. According to defendants, Count 3 cannot include *DiLeo* (because it is now an individual action) or *California Retirement* (because it is not within the ¶ 97 definition of the "Class Action and Derivative Litigation"). As for *DiLeo,* the ¶ 97 definition (and not the present character of the *DiLeo* claims) is what determines the meaning of the terms "Class Action and FDIC Litigation," and the *DiLeo* claims are clearly included in that definition. As for *California Retirement,* it was filed after these cases began and was therefore not included here until Insurers filed the Complaints. Although Count 3 specifically incorporates ¶ 98, which adds the *California Retirement* claims to the list of the underlying litigation, Insurers carelessly neglected to refer specifically to those claims in Count 3's ¶ 126 and in the Count 3 Prayer for Relief. As Insurers recently confirmed, that omission was not intentional.

As for Count 6, defendants really have no excuse for ignoring the *DiLeo* and *California Retirement* claims. Count 6 incorporates ¶¶ 97–99 and seeks a declaratory judgment as to "the claims asserted against [the defendants]." That is clearly a reference to the claims discussed in

---

**9.** Insurers' Complaints distinguish between the original derivative claims and the later-filed direct claims, even though once FDIC had substituted as plaintiff all those claims became direct claims with Continental's assignee FDIC as the claimant.

**10.** Although defendants have correctly identified FDIC's claims in *Consolidated Litigation* as settled, their memoranda failed to explain FDIC's claims in *Frankenstein* and *Vlahandreas* were also included in that settlement. This Court had to determine that fact for itself by examining the settlement agreement attached to FDIC's Counterclaim.

**11.** Neither party has discussed whether there are claims pending by any class members who opted out of *Spring, Rothschild* or *Consolidated*

*Litigation.* If there are, this opinion's treatment of the *DiLeo* claims applies to those claims as well.

**12.** Curiously, it was this Court and not Insurers who first pointed out defendants' attempt to exclude the *DiLeo* and *California Retirement* claims from Counts 3 and 6. Of course Insurers now insist those claims are included, but they nowhere explain their failure to challenge defendants' original assertion (presented as the cornerstone of defendants' Rule 12(c) motion on Counts 3 and 6, see D.Mem. 3) that all the claims relevant to Counts 3 and 6 had been settled. This is not the first time in this Court's massive expenditure of work on these lawsuits that it has had the nagging suspicion that a great deal of effort but little thought has gone into Insurers' handling of the litigation.

¶¶ 97–99, which include those in *DiLeo* and *California Retirement*.

Thus Counts 3 and 6 do seek declarations as to coverage under the Policies for all the claims listed in ¶¶ 97–99 (which this opinion will embrace within the term "Underlying Litigation"). Some of those claims are still pending. Fortunately for defendants, those facts do not really affect their legal arguments, and this Court can enter judgment on Counts 3 and 6 as to both the settled and pending claims, with only one exception.

### Count 3

Under Count 3 Insurers seek a declaration from this Court that:

1. Defendants have engaged in willful misconduct.

2. That conduct resulted in the claims made against defendants in the Underlying Litigation.

3. Federal law and public policy prohibit providing insurance coverage for losses suffered by defendants because of willful misconduct.

4. Insurers' Policies therefore cannot provide coverage for the claims made against defendants in the Underlying Litigation.

Defendants first argue there is no such applicable federal law. Next they contend even if such a federal law or public policy were assumed to exist and to apply to them, Insurers still cannot here litigate whether their insureds engaged in willful misconduct, when the underlying claims containing such charges have either been settled without a finding of misconduct or are still pending. Defendants are wrong on the first argument but right on the second.

### 1. Federal Law

Both parts of the Policies [13] provide coverage for "loss ... arising from any claim or claims ..." (DX A § 1). "Loss" is defined with the following caveat (*id.* at § 2 ¶ C):

> ... provided always that such subject of loss shall not include fines or penalties imposed by law or other matters which are uninsurable under the law pursuant to which this policy shall be construed.

Insurers say the claims in the Underlying Litigation are rendered uninsurable by the 1984 version of 12 C.F.R. § 7.5217(c) ("Section 7.5217(c)"), issued by the Comptroller of the Currency: [14]

> (c) It should be understood, however, that in order to preserve incentives for sound banking principles neither the bank's articles of association, bylaws, shareholder resolutions nor insurance shall provide for the indemnification of bank personnel who are adjudged guilty of, or liable for, willful misconduct, gross neglect of duty, or criminal acts.

That contention serves as the starting point for analytical purposes.

### A. Which Federal Law?

■ Defendants first argue Section 7.5217(c) does not apply to them because it was CIC, and not Bank, that obtained the Policies and because the individual defendants are officers and directors of both CIC and Bank. That regulation was promulgated in exercise of the Comptroller's authority under National Bank Act § 93(b)(7), 12 U.S.C. § 93(b)(7)—a statute allowing regulation of national banking associations and their directors and officers.

As defendants would have it, that authority cannot extend to a bank holding

---

**13.** Like the typical policy providing D & O coverage, Insurers' Policies contain two parts:

    1. Part A provides coverage to CIC and its subsidiaries for amounts paid to indemnify their directors and officers for claims asserted against them.

    2. Part B provides coverage to the directors and officers of CIC and its subsidiaries for claims made against them for which they do not receive direct indemnification from their corporations.

**14.** Although Count 3 refers in terms only to Part A of the Policies (see ¶ 121), both parts contain the language limiting coverage to legally insurable matters, and Insurers are seeking a declaration as to claims that could be covered by Part B as well as Part A of the Policies (see ¶ 123). This Court will therefore treat Count 3 as seeking a declaration as to the scope of coverage under both Part A and Part B.

company such as CIC and thus cannot regulate the indemnification of CIC's directors and officers.[15] If accepted, that reasoning would permit Bank, a national banking association, and its directors and officers to avoid National Bank Act regulation simply because of the corporate structuring under which Bank is a CIC subsidiary. Valid and necessary regulations cannot be so easily thwarted.

CIC obtained D & O insurance for its benefit and the benefit of all its subsidiaries, *including Bank.* To the extent the Policies provide indemnification for Bank and its directors and officers, those Policies must be held subject to Section 7.5217(c). That regulation cannot be evaded by mischaracterizing the individual defendants as sought to be indemnified by CIC or by Insurers only in their capacity as CIC directors and officers.

Of course the key to reconciling the applicability of the regulation to a bank and its inapplicability to a bank holding company (see n. 15) lies in the preceding sentence. Any individual who serves CIC alone (or who serves CIC itself qua CIC) need not confront the limitation in Section 7.5217(c). Anyone who serves only Bank *is* subject to the regulatory prohibition. And as to anyone who occupies dual capacities with CIC and Bank, the ability or inability to insure against "willful misconduct" or like activity simply depends on which hat the individual was wearing when the activity took place. In the Underlying Litigation the individual defendants are sued in their capacities as directors and officers of both CIC and Bank (see IX 1 and DRX A). But the conduct charged in those lawsuits is unquestionably Bank-related rather than CIC-related as such. That being true, Section 7.5217(c) must control any potential indemnification for those claims—if effective regulation of national banking associations is to continue, as it must.

Defendants seek to provide another string to their bow. They contend that even if the earlier-quoted 1984 version of Section 7.5217(c) *would* limit indemnification against the claims in the Underlying Litigation, that question is mooted by the amendment of the regulation to remove the limitation.[16] According to defendants, because any indemnification of the individual defendants has occurred or will occur after the effective date of the amended regulation, that version should control the question of uninsurability.

As Insurers correctly counter, the general and well-established rule is that the law in force at the time a contract is entered into is considered part of that contract. *Polytechnical Consultants v. Lind Plastic Products, Inc.,* 82 Ill.App.3d 472, 474, 37 Ill.Dec. 867, 869, 402 N.E.2d 869, 871 (1st Dist.1980). Of course that rule can be changed by express agreement of the parties, but the Policies contain no such agreement.

In Part A of the Policies "loss" is defined as (DX A ¶ 2, § C):

> any amount the Insured is required or permitted to pay to a director or officer as indemnity for a claim or claims against him arising out of those matters set forth in the insuring clause above whether actual or asserted and, subject to the applicable limits and conditions of this policy, shall include damages, judgments, settlements and costs, charges and expenses, incurred in the defense of actions, suits or proceedings and appeals therefrom for which payment by the Insured may be required or permitted according to applicable law, common or statutory, or under provisions of the Insured's charter or by-laws effective pursuant to law; provided always that such subject of loss shall not include fines or penalties imposed by law or other matters which are uninsurable under the law

---

**15.** CIC is subject to the Bank Holding Company Act, 12 U.S.C. §§ 1841–1849, which does not contain a provision comparable to Section 7.5217(c).

**16.** See 12 C.F.R. § 7.5217 (1986). Now the regulation allows national banks to provide for indemnification as permitted by the state where the bank is headquartered or by the state of the bank's holding company's incorporation (but see 12 C.F.R. § 7.5217(d)).

pursuant to which this policy shall be construed.[17]

Defendants contend that reference to "the law pursuant to which this policy shall be construed" must mean the same "applicable law, common or statutory" that determines the directors' and officers' right to indemnity. Because that is supposedly the law in force when those individuals are actually indemnified, defendants reason the amended version of Section 7.5217(c) must control the scope of the Policies' coverage.[18]

That position, although perhaps superficially plausible, is totally undercut by a careful reading of the entire paragraph and by the definition of "loss" in Part B of the Policies. First of all, the quoted Section C's final clause, as indicated by its beginning "provided always," modifies the preceding language and not vice versa. Thus if "the law pursuant to which [the Policies] shall be construed"—that is, the law in force when the Policies were issued—does differ from the "applicable law" for determining rights to indemnification, the former and not the latter must control the special question of *uninsurable* risks (the precise subject for which the former standard is specified).

There is more. Though Part B of the Policies contains an identical final proviso prohibiting coverage for losses "which are uninsurable under the law pursuant to which [the Policies] shall be construed," it lacks entirely the earlier "applicable law" of indemnification language found in Part A.[19] That means defendants have no basis at all for saying the *Part B* reference to "law" can look to current law rather than law when the Policies were issued. And that in turn means defendants are reduced

to arguing that identical clauses in two parts of the same Policies must mean different things: Part B would be controlled by the law in force when the Policies were issued, but Part A would look to the law in force when indemnification took place. Nothing in the Policies justifies such a strained reading or a deviation from the general rule. Section 7.5217(c) in the form it existed when the Policies were issued is part of "the law pursuant to which [the Policies] shall be construed."

*B. Effect of Federal Law*

■ Although Insurers have won that initial skirmish over the applicability of unamended Section 7.5217(c) to the Policies, that victory is for the most part a pyrrhic one. Insurers invoke the regulation as the source of a right to prove *in these cases* that defendants' acts of willful misconduct are responsible for the claims against them in the Underlying Litigation. That, however, is not what the regulation says.

Section 7.5217(c) prohibits only (emphasis added):

> the indemnification of bank personnel who are *adjudged* guilty of, or liable for, willful misconduct, gross neglect of duty, or criminal acts.

None of the defendants has been adjudged liable for any such conduct. None of the settlements in the Underlying Litigation includes any such adjudication (that's exactly what settlements avoid). And nothing in the regulation gives Insurers the right to litigate that issue in these proceedings. *National Union v. SeaFirst Corp.*, 662 F.Supp. 36, 39 (W.D.Wash.1986).

As for the still-pending cases included in the Underlying Litigation, again Section

---

17. [Footnote by this Court] Though this and other portions of the Policies quoted in this opinion are typed entirely in capital letters, for convenience in reading this opinion reproduces those portions in conventional form.

18. Insurers do not really challenge defendants' assumption that the law in force at the time of indemnification, rather than when the Policies were issued, is "the applicable law" referred to in the Policies. That assumption need not be examined, for defendants' argument fails even if it is assumed (arguendo) to be correct.

19. Such indemnification language would of course have no place in Part B, because that part of the Policies provides coverage to individual defendants for unindemnified losses. But the point is that there is no language at all in Part B's definition of "loss" that can be construed to call for the application of anything other than the law in existence when the Policies were issued.

7.5217(c) does not give Insurers the right to resolve the allegations of willful misconduct here via declaratory judgment. That really spells the end of Insurers' federal-law contention as to those cases as well.[20]

This common-sense reading of Section 7.5217(c) is reinforced by the principles of contract construction. It should be unnecessary to repeat that ambiguous provisions in insurance policies are construed against the insurer. That rule applies with special force to exclusionary provisions, which must be explicit in order to be effective (see the Ninth Opinion, 643 F.Supp. 1434, 1439 (N.D.Ill.1986)). Those concepts should be equally applicable when an insurer relies on a regulation, rather than an express provision in its policy, to limit its liability. If Insurers wanted the right to litigate whether the claims against their insureds are attributable to their willful misconduct—a right not explicitly provided by Section 7.5217(c)—they could have drafted such a right into the Policies themselves.[21] They did not.

*2. Public Policy*

■ Insurers insist that even if federal law does not expressly give them the right to litigate here whether the claims against defendants are attributable to their own willful misconduct, public policy requires the creation of such a right. Again Insurers are creative—but again they are wrong.

Insurers claim the Office of the Comptroller of the Currency ("OCC") has expressed concerns about directors and officers of national banks being able to avoid Section 7.5217(c) by settling claims against them rather than risking a finding of willful misconduct. That concern has led OCC to issue three private interpretive letters to individuals, requiring national banks to submit such settlements to special scrutiny before providing indemnification (IX 3). Those letters were obtained by Insurers in response to a Freedom of Information Act ("FOIA") request. In the third letter dated May 23, 1978, OCC suggested a disinterested majority of directors, a majority of the shareholders or a court should approve indemnification where officers and directors settle claims against them.

Insurers contend OCC's actions in that respect express a public policy supporting Insurers' right to pursue their Count 3 claims.[22] There are several problems with that position.[23]

Initially it is questionable whether such private letters are even cognizable by this Court in the context of a Rule 12(c) motion. Such letters can hardly be considered a matter of public record, subject to judicial notice, when Insurers had to resort to FOIA to get them. Moreover, just as in the lack of correlation between one swallow and a summer, three letters maketh not a public policy that would add an exclusion to Insurers' Policies.[24]

---

**20.** Parenthetically, Insurers would fare no better if they were able to look to state law. Under Illinois law (see, e.g., *Thornton v. Paul,* 74 Ill.2d 132, 156–57, 23 Ill.Dec. 541, 552, 384 N.E.2d 335, 346 (1979)) any such declaratory judgment would be barred as "premature" because the issue of willful misconduct is crucial to defendants' liability on some of the pending claims.

**21.** In fact, the express exclusions included in Part B show Insurers knew very well how to do expressly what they are trying to do here by implication.

**22.** Insurers also argue those letters represent an authoritative interpretation of Section 7.5127(c) by OCC. Such private letter rulings do not of course have the force of law (see *Chrysler Corp. v. Brown,* 441 U.S. 281, 301–03, 99 S.Ct. 1705, 1717–18, 60 L.Ed.2d 208 (1979)). But even were this Court to put the gloss on Section 7.5127(c)

suggested by those letters, Insurers would not be helped. As the text will explain, OCC's interpretation simply does not allow Insurers to obtain the relief Count 3 seeks.

**23.** One of those problems is not, however, defendants' counterargument based on OCC's 1980 announcement that it *might* amend Section 7.5127 (see 45 Fed.Reg. 8025 (1980)). Insurers were entitled to rely on the law, including established public policy, as it existed in 1981 when they issued the Policies. They were not required to speculate on (let alone be bound by) what OCC might do in the future.

**24.** At the outset apologies are owed to Aristotle, Cervantes and such lesser-known luminaries as John Heywood for cribbing the "one swallow" maxim. More significantly for present purposes, this inquiry has begun (as it must) with this Court's tentatively presuming the truth of

Even apart from that problem, and even on the dubious premise that OCC's private letters could somehow be viewed as an interpretation of its regulation (see n. 22), that would provide no support for Insurers' position. All OCC's letters require is that a national bank provide some means for neutral parties or a court to approve settlements of claims against directors and officers in which there are allegations of willful misconduct, before indemnifying the charged parties for such settlements. If any "public policy" can be gleaned from that, it is a policy of protecting the *bank* against the self-dealing that would be involved where accused parties approve their own exculpation. Where as here Bank itself (and not just the accused parties) has approved the settlements with the use of a special litigation committee aided by outside counsel, it has responded to that public policy. Nothing in that scenario entitles a third party—a bank's D & O insurer—to take a major leap to the assertion of its own right to litigate the willful misconduct issue post-settlement. Yet that is what Insurers want to do in Count 3.[25]

■ Finally Insurers claim Illinois public policy allows them to bring a declaratory judgment action to litigate the issue of their insureds' intentional misconduct. They cite *Industrial Sugars, Inc. v. Standard Accident Insurance Co.*, 338 F.2d 673 (7th Cir.1964) for that proposition.

*Industrial Sugars* involved an insurance policy that covered losses "caused by accident." It held the insurer entitled to a declaratory judgment as to whether a loss resulting from intentional conduct was "caused by accident"—a question of policy interpretation. *Industrial Sugars* held

that, regardless of what the parties intended, it would not construe "accident" to include intentional conduct because (338 F.2d at 676):

A contract of insurance to indemnify a person for damages resulting from his own intentional misconduct is void as against public policy and the courts will not construe a contract to provide such coverage.

That decision offers no support for the notion that Insurers should be allowed to litigate and prove, in these cases, that defendants' intentional conduct was the cause of the claims in the Underlying Litigation. *Industrial Sugars* neither examined nor discussed Illinois law on any proposition remotely resembling that (indeed it did not even discuss Illinois law on the limited question the court decided). State public policy surely does not derive from what federal courts may say about a subject quite different from the one that forms the alleged policy.[26]

There is, of course, the true sense in which *Industrial Sugars* articulated a public policy: the policy against a party's insuring against "his own intentional misconduct." But even assuming that accurately reflects *Illinois* policy (despite the total absence of any Illinois source references from the Court of Appeals' discussion), it poses no problem here. *Gulliver's East, Inc. v. California Union Insurance Co.*, 118 Ill.App.3d 589, 590–91, 74 Ill.Dec. 234, 235, 455 N.E.2d 264, 265 (1st Dist.1983) teaches the type of coverage afforded by the Policies is both valid and enforceable. By failing to provide an express exclusion for claims attributable to intentional mis-

Insurers' allegation of such a public policy (¶ 123), but that presumption vanishes with the requirement that such an allegation be "well pleaded." Defendants correctly point out there is no federal case law or federal statutory basis for such a federal public policy. Insurers' allegation cannot survive in such a vacuum, and their current limited reference to a few private interpretive letters cannot fill that void.

**25.** Judge Rothstein summarily rejected a similar argument in *SeaFirst Corp.*, No. C85–396R, slip op. (W.D.Wash. Feb. 24, 1987).

**26.** More recent opinions from our Court of Appeals—perhaps a product of today's greater sensitivity to what has come to be known as "Our Federalism"—have made it plain that federal precedents are not necessarily reliable guides to state law (see, e.g., *American National Bank & Trust Co. v. City of Chicago*, 826 F.2d 1547, 1551 (7th Cir. 1987)). That applies a fortiori to a proposed substantial extension of state law that would have to springboard from a federal precedent that didn't examine state law in the first place (see *Shaw v. Republic Drill Corporation*, 810 F.2d 149, 150 (7th Cir.1987)).

conduct and by relying instead on the exclusions provided by law (i.e., Section 7.2157(c)), Insurers contracted to provide coverage unless their insureds were adjudged liable for such misconduct in the Underlying Litigation. *Gulliver's East* says that arrangement violates no public policy (*id.*).

Insurers make much of their Count 7 allegations that the settlements of the Underlying Litigation were collusive. But those allegations have no real bearing on Insurers' Count 3 claims. Nothing in *Thornton v. Paul*—or in any other authority Insurers suggest to this Court—entitles them to a rewriting of their Policies to insert an exclusion they had the opportunity to, but did not, draft for that purpose.

Even a few moments' thought will demonstrate why that should be so. It is necessary only to remember the real significance of the fact that the prohibition against *adjudicated* determinations of willful misconduct is the only one Insurers chose to specify in the Policies. After all, few lawsuits reach the stage of a full-blown trial—something in the range of 3% of civil filings. And the obverse side of that coin is that the vast majority of civil lawsuits end in settlement. Having written the Policies as they did, Insurers cannot legitimately expect this or any other court to reshape their contractual provisions to deal with an obvious contingency

that could readily have been anticipated: a collusive settlement.

That is not to say, of course, Insurers are without remedy if collusion was in fact present. Defendants have never challenged the legal sufficiency of Count 7's claim that such collusion would be a breach of contract, thus relieving Insurers of their obligations to pay under the Policies. If Insurers were to win on that score, Count 3 would give them nothing more than Count 7 provides. And if Insurers lose on Count 7, the then concededly valid settlement would be precisely the event that the Policy exclusion, as drafted, was *not* intended to cover. Either way, then, the substantive issue of claimed willful misconduct would never be tried in these lawsuits.

Thus Count 3 does not survive either as to the previously-settled portions of the Underlying Litigation or as to the claims still pending in those lawsuits. Of course Insurers are entitled to a declaration of the principle expressed in the just-concluded analysis: that the Policies will provide no coverage for any still-pending claim that may hereafter *adjudicate* defendants liable for willful misconduct, gross neglect of duty or criminal acts.[27] With that exception, Count 3 is dismissed.

### Count 4

As it reads literally, Count 4 seeks to exclude the direct actions by CIC against its own directors and officers from coverage under *Part A* of the Policies.[28] Part A

---

**27.** Both this statement and the prior discussion have deliberately referred to an adjudication of liability on the part of "defendants"—in the plural. Of course this Court recognizes such an adjudication, if it occurred, would very likely apply to fewer than all defendants. But because that issue has not really been addressed by the parties and because the contingency may or may not arise, this opinion has not addressed the question. All the same, a few explanatory words are in order. Policies Part B § 4 provides:

The wrongful act of any insured shall not be imputed to any other insured for the purpose of determining the applicability of the exclusions enumerated in this Clause 4.

On its face that provision would not apply to exclusions required by Section 7.2157(c), for such exclusions are added to the Policies by language in ¶ 2, § C of both Parts A and B (and not by "Clause 4"). Consequently if fewer than

all defendants in the pending cases were adjudicated liable for willful misconduct, the Policies themselves would not appear to prevent Insurers from imputing such misconduct to all other defendants and thus excluding all defendants from coverage for those pending claims. Even so, it would remain to be decided whether some other rule of substantive law might bar Insurers from doing so.

**28.** Count 4 ¶ 128 refers to:

the coverage provided to [CIC] ... to reimburse [CIC] for amounts which it pays to indemnify its directors and officers.

Then ¶ 131 asserts direct claims cannot be included because such coverage would provide CIC with a windfall. Finally the Prayer for Relief seeks only a declaration that CIC is not entitled to such coverage. Thus everything in Count 4 points to a claim of noncoverage under Part A.

provides coverage to CIC for amounts it pays to indemnify its directors and officers, but defendants correctly point out no such indemnification has taken place for the direct actions in question (all of which have now been settled). On its face, then, Count 4 seeks relief from claims CIC will never make.

■ Insurers now say Count 4 really does not mean what is says.[29] Instead Count 4 is now characterized as challenging Part B's coverage of direct actions (Part B protects CIC's directors and officers when CIC does not indemnify them). Because defendants do not challenge that rewriting of Count 4, this opinion will address that claim and not the one Count 4 really asserts.[30]

As was true with Count 3, Insurers' Count 4 claim faces a significant obstacle: Their Policies do not expressly exclude coverage for direct actions. Part B provides coverage for (DX A ¶ 1):

> loss ... arising from any claim or claims made against the insureds ... by reason of any wrongful act....

Part B ¶ 2, § D then defines "wrongful act" as:

> any breach of duty ... so alleged by any claimant.... Part B ¶ 4 lists fully ten express exclusions from that coverage, but direct actions by CIC are *not* on that list of exclusions.

Insurers seek to overcome that hurdle by alleging (¶ 130):

> pursuant to [the] custom and practice [of the D & O liability insurance industry]

Continental, RBH and [Insurers] did not intend the Policies to cover litigation brought by Continental (or its assignee) directly against its officers and directors.[31]

In other words, Insurers hope to add an exclusion to the Policies because of an established custom and practice in their industry. Defendants (not surprisingly) urge Insurers' custom and practice allegations can have no legal effect on the scope of the Policies' coverage. Defendants are correct.

This Court had to deal extensively with custom and practice allegations in the Eighteenth Opinion, 658 F.Supp. 781, 788–90 (N.D.Ill.1987). Although evidence of custom and usage is always admissible to *explain* the meaning of even unambiguous express terms in a contract, such evidence cannot be used to *contradict* such express terms and thus undo what the parties have expressly provided for (*id.* at 789–90). This Court finds Insurers' ¶ 130 allegations serve the latter purpose and can therefore have no legal effect.[32]

What Insurers want to prove via custom and practice is that the terms "any claim" and "any claimant" in fact mean "some claims" and "some claimants." That cannot be viewed as anything but an attempt to contradict the express Policy terms. True enough, the term "any claim" is in a sense internally limited by other terms in the Policies themselves, for Part B contains a list of ten types of claims that are in fact not covered.[33] But nothing in the Policies

---

**29.** Actually it was defendants who first suggested Insurers can't mean what they said and must be seeking to exclude claims from Part B (D.Mem. 11). Insurers agreed with alacrity (I.Mem. 12). This is not the first time Insurers have sought to "amend" one of their claims via memorandum (see the Nineteenth Opinion, 658 F.Supp. 775, 778 (N.D.Ill.1987)).

**30.** Had Count 4 survived this opinion (as it does not), Insurers would have been required to rewrite their claim accordingly.

**31.** [Footnote by this Court] Because Continental assigned its rights to FDIC, all the direct actions were actually brought by FDIC. Insurers say if direct actions by Continental are excluded, such actions by its assignee FDIC are also excluded. D.Mem. 12 disputes that, saying direct actions

by FDIC may be covered even if direct actions by Continental are not. Because Count 4 fails even on Insurers' view of the issue, it need not be decided.

**32.** Judge Rothstein rejected a similar attempt to exclude direct actions from coverage using extrinsic evidence in *SeaFirst,* No. C85–396R, LEXIS (Genfed library, Dist. file) slip op. at 5–8 (W.D.Wash. Mar. 18, 1986) (DX D). That case, however, did not involve allegations of custom and practice.

**33.** That fact, however, really cuts *against* Insurers: It creates the strong negative inference that an unlisted item *is* covered.

even hints at a limitation on coverage because of the indemnity of a claimant, and that is the kind of unstated limitation Insurers are seeking to add by excluding claims by Continental against its own directors and officers.[34]

Insurers invoke *Sunstream Jet Express, Inc. v. International Air Service Co., Ltd.,* 734 F.2d 1258 (7th Cir.1984) and several other cases to argue they must be allowed to use custom and practice evidence to show "any claimant" is an ambiguous term and really means "any claimant but Continental."[35] But Count 4 is readily distinguishable from the use of custom and practice evidence allowed in *Sunstream* and any other case cited by Insurers. Each of them involved the permissible explanatory use, not the impermissible flatly contradictory use, of such evidence.

Under Illinois law the kind of coverage exclusion for which Insurers contend—an exception to a policy written in an "all risk" form with specified exceptions—must be expressly and clearly provided for in the Policies themselves (see *Reis v. Aetna Casualty & Surety Co. of Illinois,* 69 Ill. App.3d 777, 786, 25 Ill.Dec. 824, 831, 387 N.E.2d 700, 707 (1st Dist.1978)). Direct actions by a corporation against its own directors and officers are as old as the law of corporations (after all, the case law de-

fining the fiduciary obligations of those persons was the case law dealing with breaches of those very obligations). If Insurers intended to exclude claims brought by Continental, they should have said so in the Policies they drafted—instead of saying just the opposite. They cannot now use evidence of custom and practice to overcome their own omissions in draftsmanship.

Because Insurers' allegations of custom and practice thus have no legal effect, Insurers are not entitled to the relief they seek in their "amended" Count 4. Part B of their Policies provides coverage for the direct actions brought by FDIC, because those claims are not excluded by any express provision in the Policies.

### Count 5

Insurers' Count 5 claims attack (1) CIC's assignment to FDIC of the corporate claims against CIC's former directors and officers and (2) FDIC's pursuit of those direct claims. Insurers allege (¶¶ 138–39):

> 138. As a shareholder of Continental, the FDIC does not have standing to bring mismanagement claims arising out of events which occurred prior to the acquisition of its shares in Continental, nor does it have the authority to pursue such claims in the name of Continental and the Bank.[36]

---

**34.** Insurers would have to plead innocent to any charge of logical consistency. They do not dispute that derivative actions are covered by the Policies. Yet the only distinction between derivative and direct actions is the technical identity of the claimant—both are brought for the corporation's benefit. What would Insurers say as to an action brought by a shareholder as a derivative action, then taken over by the corporation? Coverage or no coverage, and why or why not?

**35.** Parenthetically, Insurers fail to explain their ability to allege an established custom and practice in light of National Union's own policy at issue in *FDIC v. National Union,* 630 F.Supp. 1149 (W.D.La.1986). That policy, also issued in 1981 to a national bank, contains *express language* in a separate endorsement whose specific purpose was to exclude direct actions (*id.* at 1152). Even more significant than a single reported policy, part of the supplemental materials defendants tendered with their Reply Memorandum was the Directors & Officers Underwriting Manuals (1977 version) promulgated by Na-

tional Union's parent company, American International Group (DRX E), which included among its Sample Endorsements one specifically excluding claims brought by one insured against another, coupled with this explanation:

> This wording is a standard exclusion on all newly written banks, ...

In light of that, it is truly mystifying how Insurers can say policies written *without* that endorsement can draw upon notions of custom and practice under Illinois law, which holds a custom and practice is binding only when it is "uniform, long-established and generally acquiesced in...." *Clark v. General Foods Corp.,* 81 Ill.App.3d 74, 78, 36 Ill.Dec. 447, 451, 400 N.E.2d 1027, 1031 (3d Dist.1980).

**36.** [Footnote by this Court] Insurers' use of "standing" does not denote the usual constitutional or jurisdictional usage of the term. Instead Insurers are simply challenging FDIC's right to bring the direct actions (1) under the assignment from CIC and (2) under principles of equity. Conversely, defendants do question Insurers' standing (in the classic sense) to bring

139. The directors of Continental and the Bank do not have the corporate power to delegate or assign the enforcement of claims against their directors and officers to a third party such as the FDIC nor to enforce those claims for the benefit of a shareholder which does not itself have standing to bring those claims.

This Court's obligation to accept as true all well-pleaded factual allegations does not extend to such conclusory legal propositions. Insurers must at least explain them to defeat defendants' motion. Defendants, however, would deny Insurers even the opportunity to do so.

### 1. Insurers' Standing

▇ Defendants challenge Insurers' Article III standing to assert Count 5. *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) explained (citations omitted):

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," ... and that the inquiry "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision,"....

According to defendants, Insurers cannot challenge FDIC's right to pursue the direct actions because Insurers' alleged injury (the need to defend against FDIC's counterclaim) cannot be fairly traced to the allegedly invalid assignments as required by *Valley Forge.* Insurers respond by pointing to the Declaratory Judgment Act as assertedly entitling them to a declaration of the extent of coverage under the Policies. That of course misses the boat

the selfsame Count 5 claims. To avoid confusion, this opinion will not use the term "standing" when discussing *Insurers'* Count 5 contentions.

37. *SeaFirst,* —— F.Supp. ——, No. C85–396R, slip op. (W.D.Wash. Aug. 12, 1986) summarily accepted a similar challenge to an insurer's standing, but the opinion also noted the insurer's substantive arguments lacked merit.

entirely, for standing is a constitutional-jurisdictional requirement and the Declaratory Judgment act is not a source of jurisdiction. *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671–72, 70 S.Ct. 876, 879, 94 L.Ed. 1194 (1950).

Defendants say *FDIC v. Hurdman,* 655 F.Supp. 259 (E.D.Cal.1987) supports their standing argument.[37] There FDIC was pursuing another claim assigned to it by CIC under the "assistance agreement" between them.[38] *Hurdman* held the defendants in that action had no standing to challenge the legality of the rescue operation because their injury (FDIC's claim against them) was not fairly traceable to that operation. *Hurdman* sought to ring all the changes on the subject and concluded the claim would have been assertable—by FDIC as assignee, or as receiver if the bank failed, or even by the bank itself—irrespective of the assistance agreement.

Defendants insist the same analysis (and hence the same result) applies here. But the very nature of Insurers' claims demonstrates FDIC's challenge to Insurers' standing has no force. If it is assumed (correctly enough) CIC could have filed the same claim had no assignment been made, the issue posed by ¶ 138 could not have been posed against CIC's lawsuit. In that sense, then, the assignment to FDIC is necessary to Insurers' claim and therefore a cause of the alleged injury. And if it is assumed (as *Hurdman* does without proof) Bank would have gone down the tubes without FDIC's bailout, neither issue presented by Count 5 would have been posed:

> 1. ¶ 138's claim, because FDIC would have to be suing as receiver and not shareholder;

38. Under that agreement CIC assigned various claims and issued CIC stock to FDIC, in return for which FDIC assumed certain of CIC's debts. As a result of the various transactions FDIC became the holder of 80% of CIC's common stock. CIC's shareholders exchanged their CIC stock for stock in a holding company, which now owns the remaining 20% of CIC's common stock (see ¶¶ 99, 137 and IX 7).

2. ¶ 139's claim, because FDIC would have to be suing as a statutory successor and not a contractual assignee.

Again the assignment to FDIC is a condition precedent to Insurers' claims as made.

In summary, Insurers meet the *Valley Forge* requirement *if* their Count 5 claims are sustainable. This opinion turns to that question.

### 2. CIC's Authority To Assign

■ Count 5 ¶ 139 reads as a challenge to CIC's corporate authority to assign to a third party CIC's claims against its own directors and officers. But Insurers fail to point to any provision in CIC's articles of incorporation or by-laws or any statutory provision that would prohibit such an assignment.[39]

Insurers' memorandum reveals a much more technical position. As part of FDIC's bailout of CIC, Continental Illinois Holding Corporation ("Holding") was created. All of CIC's common stock was then exchanged for shares in Holding, so CIC became a wholly-owned subsidiary of Holding. According to Insurers, that transaction caused Holding and not CIC to own the rights to the direct actions. Because FDIC's assignment ran from CIC, FDIC purportedly received nothing.

That scenario is based on "facts" not found in the pleadings. Insurers draw their information from a Prospectus/Proxy Statement issued shortly before a meeting of CIC's shareholders called to approve the assistance agreement (IX 7). Though defendants do not challenge that document's authenticity,[40] this Court could well ignore it on the current motion. But since the argument is so empty, it might as well be disposed of quickly.

Insurers call on *Fischer v. CF & I Steel Corp.*, 599 F.Supp. 340 (S.D.N.Y.1984), which stands for the unexceptionable prop-osition that the right to a pending cause of action of a merged corporation passes to the corporation surviving the merger (*id.* at 345, quoting *Lewis v. Anderson*, 453 A.2d 474, 479 (Del.Ch.1982), *aff'd*, 477 A.2d 1040 (Del.1984)). But the *Fischer* court (*id.*) understood (as Insurers' counsel do not) the fundamental difference between a straight merger (in which the merged corporation goes out of existence and the surviving corporation acquires all its assets, subject to all its liabilities, as a matter of law) and a reorganization (via merger or otherwise) that results in the acquisition of stock by a holding company (in which the subsidiary's corporate existence remains intact and it retains all its assets, subject to its liabilities, cf. *Schreiber v. Carney*, 447 A.2d 17, 22 (Del.Ch.1982)).

All Insurers' counsel have done is to add another course—Corporation Law 101—to the refresher curriculum for which they have evidenced a need during the flood of motions and briefing these cases have generated. What they have *not* done is to negate the basic proposition that CIC, which remained intact after the bailout transaction, retained its assets—including the direct claims—and hence retained the ability to assign them to FDIC.

### 3. Bangor Punta

■ Finally Insurers claim FDIC is foreclosed from pursuing the direct claims by *Bangor Punta Operations, Inc. v. Bangor & Aroostock Railroad Co.*, 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974). There Bangor Punta acquired almost all the stock of the railroad company ("BAR"). After several years of such control, Bangor Punta sold all its BAR stock to Amoskeag Company ("Amoskeag"). After the sale BAR filed a direct action against Bangor Punta, alleging mismanagement and misappropriation of BAR's assets while Bangor

---

**39.** In that respect, it is worth noting that cases such as *Hurdman,* 655 F.Supp. at 264 and *FDIC v. Rectenwall,* 97 F.Supp. 273, 274–75 (N.D.Ind. 1951) (a case decided by now Senior Judge Luther Swygert of our Court of Appeals when he was still a District Judge) have actually upheld the assignment from banks to FDIC of otherwise unassignable claims.

**40.** Defendants have submitted other documents that flesh out that exhibit's cursory explanation of the complicated transactions undertaken pursuant to the assistance agreement. It is really unnecessary to delve into those, for Insurers' claim carries its own death warrant.

Punta controlled BAR. That suit was held equitably barred for two reasons:

1. Amoskeag, the true beneficiary of any recovery by its subsidiary BAR, had acquired its shares from Bangor Punta, the alleged wrongdoer (417 U.S. at 710–11, 94 S.Ct. at 2582–83).

2. Any recovery by Amoskeag would be unjust enrichment because Amoskeag purchased the BAR stock after the alleged wrongdoing, and it had received full value for its money (*id.* at 715–16, 94 S.Ct. at 2585–86).

Insurers really make two separate arguments. First they say that although FDIC expressed its claims in the Underlying Litigation as direct actions, it was really suing as CIC's majority shareholder, a position it acquired after the alleged wrongdoing. Accordingly the contemporaneous-ownership rule should apply to bar FDIC's pursuit of those claims. Next Insurers say *Bangor Punta* applies because FDIC obtained its shares from CIC, a wrongdoer, and would therefore be unjustly enriched by any recovery. Both those contentions lack merit.

*Bangor Punta,* 417 U.S. at 708 & nn. 3 and 4, 94 S.Ct. at 2582 & nn. 3 and 4 did indeed refer to the contemporaneous ownership rule for derivative actions (see Rule 23.1(1) and *SeaFirst Corp. v. Jenkins,* No. C83–771R, slip op. at 2 n. 1 (W.D.Wash. July 2, 1986)), though the Supreme Court did not rest its decision on that ground. But this Court need not pause on the inapplicability of *Bangor Punta* as a precedent here, for Insurers do not explain why this Court should ignore CIC's valid assignment of its rights to FDIC and treat the direct actions as derivative.[41]

After all, there were preexisting derivative actions, all filed by qualified shareholders before the assistance agreement even existed. Thus CIC's assignment to FDIC was not necessary to preserve the claims of director-officer wrongdoing.

As for applying derivative-suit concepts to FDIC's claims, that would ignore the nature of the entire bailout transaction. FDIC's ultimate level of stock ownership in CIC was uncertain—it was dependent on Bank's future operations—and no inflexible use of the contemporaneous-ownership concept should be allowed to blur the negotiated acquisition of CIC's rights to pursue like claims of wrongdoing as a component of the FDIC–CIC deal. Because this Court has already found the assignment valid, that should be the end of it.

■ Insurers' other *Bangor Punta*-derived arguments, however, still need examination because they do not rest on invalidity of the CIC-to-FDIC assignment. There are two such arguments.

First, in *Bangor Punta* BAR was not permitted to sue because Amoskeag, the true beneficiary of any recovery, had bought its shares from Bangor Punta, the alleged wrongdoer in BAR's direct action (417 U.S. at 710–11, 94 S.Ct. at 2582–83).[42] Insurers say that principle should stop FDIC from pursuing CIC's direct claims.

There is a short answer to that proposition even if its questionable minor premises were resolved in Insurers' favor: CIC is *not* the "wrongdoer" in the lawsuits at issue in Count 5—the direct claims.[43] In-

---

**41.** *Bangor Punta, id.* at 711–13, 716–17 n. 13, 94 S.Ct. at 2583–84, 2585–86 n. 13 did note BAR's action was in substance derivative because BAR was almost wholly owned by Amoskeag, which would thus be the real beneficiary of any recovery by BAR. But that piercing of the corporate veil (dealing with substance rather than form, *id.* at 713, 94 S.Ct. at 2584) was not done to apply the contemporaneous ownership rule (which most cases treat as procedural rather than substantive in nature, *id.* at 708 n. 3, 94 S.Ct. at 2582 n. 3) to bar the lawsuit. Instead *Bangor Punta* ignored BAR and looked to Amoskeag only in applying equitable doctrines such as unjust enrichment.

**42.** That tainted-shares concept applies to direct actions where a shareholder buys all or substantially all shares of a corporation and then causes the newly-acquired subsidiary to sue the seller of the stock for prior mismanagement (417 U.S. at 710, 94 S.Ct. at 2583).

**43.** Though the Underlying Claims (brought by individual shareholders and the shareholder class) are asserted against CIC as well as officers and directors, those claims are not the target of Count 5.

stead it stands as the allegedly *injured* party. Hence FDIC did not acquire the direct claims from an alleged wrongdoer at all, and the equitable bar recognized in *Bangor Punta* is simply inapplicable.

Nor is FDIC impacted by the *Bangor Punta* concept of unjust enrichment. Wholly unlike the situation there, CIC assigned its rights to the direct claims to FDIC as part of the consideration for the assistance agreement. In return for those claims and stock in CIC, FDIC assumed a large part of Bank's debt to the Federal Reserve Bank of Chicago. Any recovery by FDIC on the direct claims would thus be part of the value received for assuming Bank's debt. *Bangor Punta* does not bar recovery in such a situation (see *Meyers v. Moody*, 693 F.2d 1196, 1207 (5th Cir.1982), *cert. denied*, 464 U.S. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983); see also *FSLIC v. Reeves*, 816 F.2d 130, 133 (4th Cir.1987)). True enough, CIC's other shareholders will not share directly in any recovery by FDIC, but they have already been direct beneficiaries of the assistance agreement under which the claims were assigned to FDIC. Absent that bailout, the then-perceived prospects for Bank were such as to render the CIC shares imminently worthless.

\*     \*     \*     \*     \*     \*

In summary, all Insurers' legal arguments in support of their Count 5 claims are meritless. Judgment is entered for defendants on those claims.

### Count 6

In Count 6 Insurers seek to exclude certain claims from coverage under Part B of the Policies. They allege in ¶¶ 141–48 and their Prayer for Relief:

1. Defendants committed acts of dishonesty or acts that contributed to their own personal profit or advantage.

2. Many if not all the claims in the Underlying Litigation are attributable to those acts.

3. CIC could not indemnify its directors and officers for such claims.[44]

4. Any such claims are excluded from coverage under Part B.

As with Count 3, Insurers' Count 6 claims are premised on Insurers' right to prove in these actions that (a) defendants committed such acts and (b) the claims in the Underlying Litigation were caused by those acts. Any such right must come from the Policies themselves, and once again Insurers run into trouble on that premise.

#### 1. Dishonesty Exclusion

■ Insurers' Policies ¶ 4, § E exclude from coverage under Part B any claim: brought about or contributed to by the dishonesty of the Insureds; however, notwithstanding the foregoing, the Insureds shall be protected under the terms of this policy as to any claims upon which suit is brought against them, by reason of any alleged dishonesty on the part of the Insureds, unless a judgment or other final adjudication thereof adverse to the Insureds shall establish that acts of active and deliberate dishonesty committed by the insureds with actual dishonest purpose and intent were material to the cause of action so adjudicated.

Defendants state—and Insurers admit—none of the Underlying Litigation has established acts of deliberate dishonesty by any defendant. All claims in those lawsuits either (1) have settled without any sort of adjudication or admission of wrongdoing by defendants or (2) are still pending. Defendants assert those facts defeat Insurers' attempt to exclude claims under the dishonesty provision, because by its own terms that exclusion is limited to situations where the underlying litigation has "established," by "a judgment or other final adjudication," the insureds' commission of "acts of active and deliberate dishonesty." Defendants are again right.

Their reading is supported not only by the literal Policy language but by cases

---

**44.** CIC has in fact indemnified its former directors and officers for the settlement of the class claims against them in *Consolidated Litigation*, and it seeks reimbursement under Part A of the Policies in its Counterclaim. Insurers cannot raise the Part B exclusions as a defense to CIC's Counterclaim, and this opinion does not address the defenses Insurers have opposed to that Counterclaim.

**1198**

interpreting very similar policy language (see *Atlantic Permanent Federal Savings & Loan Association v. American Casualty Co. of Reading, Pa.*, 670 F.Supp. 168, 171–72 (E.D.Va.1986); *National Union v. SeaFirst Corp.*, 662 F.Supp. 36, 39 (W.D.Wash.1986)). Both those cases relied on *Pepsico, Inc. v. Continental Casualty Co.*, 640 F.Supp. 656 (S.D.N.Y.1986), where the insurance policy (*id.* at 659) (emphasis in original):

> exclude[d] coverage for any payments "brought about or contributed to by the dishonesty of the Directors or Officers." The policy will cover, however, the costs of defending the directors and officers against alleged dishonesty *"unless a judgment or other final adjudication* thereof adverse to the directors and officers shall establish that acts of active and deliberate dishonesty committed by the directors and officers with actual dishonest purpose and intent were material to the cause of action so adjudicated."

All the underlying civil claims in *Pepsico* were settled, and *Pepsico* held that under the policy terms the insurer could not later litigate the question of dishonesty (*id.* at 660). As *Atlantic* explained the meaning of very similar policy language (at 172):

> The word "thereof" refers to the suit against the directors and officers and unless there is a judgment adverse to them in the underlying suit, then the exclusion does not apply.

This Court agrees. At worst the language of the dishonesty exclusion in the Policies (and in those at issue in *Atlantic* and *Pepsico*) is ambiguous (though even finding an ambiguity would give Insurers

more credit than they are entitled to). As Insurers had to know even before this litigation—and as they must surely have learned by now—ambiguous policy provisions must be construed against the insurer that drafted the policy (see the Ninth Opinion, 643 F.Supp. 1434, 1439 (N.D.Ill. 1986)).

Insurers therefore cannot now litigate whether the settled claims were in fact attributable to defendants' dishonest acts. And as for the still-pending claims, the same Policy reading operates in a different way: Insurers' Count 6 claim is premature.[45] Under their Policies they must await the outcome of those pending underlying claims.[46]

Insurers vainly attempt to distinguish *Pepsico* (and thereby *Atlantic* and *SeaFirst*, which followed that case). They urge *Pepsico* should not apply here because the insurer there (1) participated in the settlements and (2) was proceeding under the corporate reimbursement portion of the policy, which did not contain a dishonesty exclusion. Both those arguments miss the point, and the second of them is simply wrong.

While it is true the corporation and not its directors and officers were seeking reimbursement from the insurer in *Pepsico*, that is not why the insurer was held barred. As shown by the definition of "loss" in the *Pepsico* policy (640 F.Supp. at 659), it was a single unified policy, providing coverage for losses to Pepsico and its directors and officers. Accordingly the policy's dishonesty exclusion applied to claims by all the insureds. It was the language of that exclusion, and not the

**45.** Even if the Policies themselves did not make their claims premature, Illinois law would do so. By definition the finding of deliberate dishonesty must be material to the underlying claim, and any adjudication of such a material issue here before the resolution of all those claims would be premature (*Thornton*, 74 Ill.2d at 156–57, 23 Ill.Dec. at 552, 384 N.E.2d at 346).

**46.** Unlike the situation as to Insurers' Count 3 claims of willful misconduct, it would be inappropriate for this Court to render any declaration now as to the deliberate dishonesty exclu-

sion. After all, any judgment adverse to defendants in the pending cases would necessarily involve a determination of whether or not they were liable for willful misconduct (the gravamen of certain claims there). But that liability might or might not implicate deliberate dishonesty. It cannot now be told whether, even assuming defendants were held liable in the pending cases, further litigation will then be necessary to determine if those adverse judgments established acts of deliberate dishonesty material to the causes of action.

absence of a dishonesty exclusion for corporate reimbursement, that prevented the insurer from later litigating the dishonesty issue.

As for the insurer's approval of the settlement in *Pepsico,* Insurers ignore the fact that the insurer there also expressly reserved the right to challenge that settlement later (*id.* at 658). That reservation of rights really put the insurer in the same posture as Insurers here. But in any event those matters were really irrelevant to the holding in *Pepsico.* Once more, the insurer there was blocked from litigating the dishonesty issue because of the language in the dishonesty exclusion of its policy, and *not* because it approved the settlement.

Finally, Insurers call upon their Count 7 allegations, charging the settlements in the Underlying Litigation were collusive, as the means to open the floodgates and allow Insurers to ignore their own Policies' language. Not so. There is no need to repeat this opinion's analysis of the parallel argument in the Count 3 context. It applies with equal force to Count 6.

### 2. Personal Profit Exclusion

■■■ Part B ¶ 4, § B of the Policies excludes from coverage any claim:

> based upon or attributable to their gaining in fact any personal profit or advantage to which they were not legally entitled.

Count 6 also invokes that provision, asserting the claims in the Underlying Litigation are attributable to defendants' illegal personal profiteering and are therefore excluded from coverage.

Unlike their dishonesty exclusion, the Policies' personal profit exclusion contains no requirement of an adverse final adjudication before the exclusion comes into play.[47] That means the settlement of underlying claims has no effect on the personal profit exclusion.

But Insurers are not home free. Their effort to deny coverage because of personal profiteering runs smack into another wall: the allegations in the underlying claims themselves. With only a single exception (discussed a bit later), no charges of illegal profiteering by any defendant are made in either the settled or the pending underlying claims.

What the Policies exclude are any claims "based upon or attributable to" personal profiteering.[48] That language does not authorize Insurers to second guess the plaintiffs in the Underlying Litigation. Yet that is precisely what Insurers attempt to argue. They contend that even though the plaintiffs in those cases made no allegations of illegal personal profiteering,[49] Insurers know better and should be allowed to prove the underlying claims were really attributable to such illegal activity.

Such an impermissible reading of the personal profit exclusion would convert it into a black hole into which virtually every claim made against an insured can potentially be drawn. Nothing in the Policy language supports that concept. Claims are simply not "based upon or attributable to" certain conduct unless they *allege* such conduct.

Insurers identify just two allegations in the Underlying Litigation that arguably fit

---

**47.** In fact that difference in language provides still another—and especially powerful—piece of evidence supporting this opinion's analysis of the dishonesty exclusion. It is unnecessary merely to assume that Insurers knew how to draft policy language that excluded coverage based on the *existence* of an underlying fact, rather than based on that fact's having been adjudicated in another lawsuit. Insurers have provided the best possible proof of that proposition by actually drafting such an exclusion. Everyone must realize what conclusive negative inference flows from that.

**48.** This does not mean, as defendants argue, that such claims are limited to those actually seeking to recover such profits.

**49.** *Consolidated Litigation* Count VIII (DRX A) did advance a claim against James Harper seeking to recover his profits from alleged trading on insider information. But that claim was later dismissed, and Harper is no longer a defendant in these cases (see the Fifth Opinion, 110 F.R.D. 621 (N.D.Ill.1986)).

that description. They are wrong as to one and right as to the other.

First, *Consolidated Litigation* Complaint ¶ 26(b) (DRX A) alleges:

> Continental established bonus incentives based on loan volume expansion. Thus, during the class period, contrary to the statements in paragraph 25 Continental created structures and internal pressures which encouraged or permitted lending officers at every level of authority to take on greater lending risks.

Even when read in isolation, that allegation fails to say any individual defendants were not legally entitled to those bonus incentives. And a contextual reading provides clear refutation of Insurers' position. Complaint ¶ 26(b) is part of a class claim for securities fraud, included solely as an example of how Continental's descriptions of its lending practices were allegedly misleading. It has nothing at all to do with personal profiteering by any of the individual defendants (see DRX ¶¶ 22–26).

Insurers' second example fares better. Several underlying claims allege John Lytle ("Lytle") received unsecured loans from Penn Square Bank (see, e.g., DRX A ¶ 28(f)).[50] It is implicit (if not explicit) in those claims that the loans were improper,[51] and it is fair to read the claims against Lytle as "based upon or attributable to" those loans. That does not, however, enmesh any other defendant: Policies Part B § 4 provides that wrongful acts of one insured will not be imputed to other insureds for purposes of applying exclusions.

Insurers proffer one final argument as to the personal profit exclusion—they again advert to their Count 7 allegations, and this time they add defendants' settlement of an unrelated claim in *FDIC v. Anderson*, 85 C 4172 (N.D.Ill.). They say defendants profited by collusively settling the underlying claims and that unrelated claim. Again they must lose in their efforts to expand the scope of their collusive settlement contentions, which plainly have nothing to do with whether *the underlying claims* are attributable to defendants' personal profiteering. Again if any settlements were in fact collusive and entered into to maximize a recovery under the Policies, Insurers' remedy is under Count 7.

In sum, except for the Lytle claims there is no basis for Insurers' Count 6 effort to exclude claims from coverage as grounded on illegal personal profiteering. Defendants' motion is therefore granted on Count 6 except as to defendant Lytle. Insurers will have the opportunity to prove the underlying claims against Lytle were or are attributable to his illegal personal profiteering.[52]

### Conclusion

Defendants' motion is granted on Counts 4 and 5, and also on Count 6 except for the personal-profit exclusion claim against defendant Lytle. Accordingly, judgment (with that one exception) is entered for defendants on those claims. On Count 3 Insurers are entitled to a declaration that there is no coverage under the Policies for any pending claim that may hereafter adjudicate defendants liable for "willful misconduct, gross neglect of duty or crimi-

---

**50.** Those claims also contain the allegation that "defendant Lytle, and at least two other Continental officers or employees" also received such unsecured loans. Those "others," however were not defendants in the Underlying Litigation and thus faced no claims based on personal profiteering.

**51.** Lytle is a codefendant in criminal conspiracy and mail fraud charges pending in this District, asserting fraudulent activities with Bank as the target and resting in part on the Penn Square loans. By sheer chance this District Court's random assignment system delivered the crimi-

nal case to this Court's calendar, and trial is now set to begin October 13, 1987.

**52.** Although some claims are still pending, none of them actually seeks recovery of any illegal profits from Lytle. That means it will not be "premature" to adjudicate the issues under the personal profit exclusion in this Court (see *Thornton*, 74 Ill.2d at 156–57, 23 Ill.Dec. at 552, 384 N.E.2d at 346). However, some of the discovery on the Lytle-related claims will undoubtedly be delayed because of the pending criminal charges referred to in n. 51.

acts." In all other respects, defendants' motion is granted as to Count 3.[53]

---

**53.** Magistrate Joan Lefkow has the often unenviable task of supervising discovery in these cases. After this opinion was completed but while it was in the process of being transcribed, Insurers brought a motion (submitted at this Court's July 20, 1987 regular motion call) to set aside a July 1 ruling by Magistrate Lefkow that had (1) denied Insurers' motion to compel certain discovery and (2) granted Continental's motion for a corresponding protective order. To the extent the motion to set aside was grounded on the claimed relevance of the discovery to

Count 7, this Court denied the motion in an oral bench ruling that same day, July 20. Insurers' other grounds were predicated on relevance of the discovery to Counts 3 and 6, so this Court (not wanting to telegraph its forthcoming ruling on the current motions) said it was briefly deferring its ruling on that aspect of the motion to set aside. At this point it is appropriate to deny that motion in its entirety, and a minute order is being entered to that effect contemporaneously with this order.